CUNNINGHAM et al., Appellants,

v.

ST. ALEXIS HOSPITAL MEDICAL CENTER et al. Appellees.

[Cite as *Cunningham v. St. Alexis Hosp. Med. Ctr.* (2001), 143 Ohio App.3d 353.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 77836.

Decided April 12, 2001.

356

*Bilfield & Sandel Co., L.P.A., Martin L. Sandel* and *Mark A. Eskenazi,* for appellants.

*Reminger & Reminger Co., Gary H. Goldwasser, Clifford C. Masch* and *Erin Stottlemyer Gold,* for appellees 4M Emergency Systems, Inc. and Moudaccer Mounajjed, D.O.

*Bonezzi, Switzer, Murphy & Polito, William D. Bonezzi* and *Steven J. Hupp,* for appellee St. Alexis Hospital Medical Center.

*Weston, Hurd, Fallon, Paisley & Howley, L.L.P., Daniel A. Richards* and *Ronald A. Rispo,* for appellee Rajendra K. Mehta, M.D.

---

TIMOTHY E. MCMONAGLE, Judge.

Plaintiffs-appellants, Mattie L. Cunningham, individually and as mother and next-of-kin of her three minor children, and Tanya Monroe, appeal the judgment of the Cuyahoga County Court of Common Pleas, rendered after a jury verdict, in favor of defendants-appellees, Saint Alexis Hospital Medical Center, 4M Emergency Systems, Inc., Rajendra K. Mehta, M.D., and Moudaccer Mounajjed, D.O. The many errors that occurred during trial of this matter mandate that we reverse and remand for a new trial.

On January 9, 1997, appellants filed suit against appellees, alleging that appellees' negligent failure to diagnose and treat Cunningham's bacterial infection caused an acute systemic response that ultimately resulted in the amputation of her legs, right arm, and left hand.

Trial commenced on November 8, 1999, and continued through November 23, 1999. After two days of deliberation, the jury returned a verdict in favor of appellees.

Appellants filed a motion for a new trial, which the trial court denied after a hearing. Appellants timely appealed, raising six assignments of error.[1]

Appellants' first assignment of error states:

"I. The trial court committed prejudicial error during jury selection."

In their first assignment of error, appellants assert that the trial court committed prejudicial error during jury selection when it (1) failed to adequately hear and evaluate appellants' objection that a peremptory challenge exercised by appellee St. Alexis Hospital Medical Center was racially motivated, (2) denied appellants' motion to strike for cause a prospective juror who was a medical doctor in her third year of residency, (3) granted six peremptory challenges to appellees but limited appellants to three peremptory challenges, and (4) allowed appellees to confer among themselves regarding the potential exercise of defense

---

1. Appellants' assignments of error are set forth in Appendix A to this opinion.

peremptory challenges. The record supports appellants' argument with respect to their objection to the peremptory strike by St. Alexis Hospital of Juror Number 7.

Appellee St. Alexis Hospital exercised its first peremptory challenge by striking Juror Number 3, an African American, from the panel. St. Alexis Hospital exercised its second peremptory challenge to Juror Number 7, another African-American juror. Appellant Mattie Cunningham is African American.

Because Juror Number 7 was the second African-American juror to be challenged peremptorily by St. Alexis Hospital, counsel for appellants objected to appellee's use of its challenge to exclude another African American. The record reflects the following colloquy:

"MR. SANDEL: On the record, we object to the peremptory challenge of this juror. We believe that she is being challenged because she is black and for no other reason. We object on the basis of *Watson v. Cleveland Clinic*, 8th District Court of Appeals. We ask the defendants to state their reason for challenging this juror.

"THE COURT: Mr. Bonezzi.

"MR. BONEZZI: Your Honor, the reasons that I have used the peremptory on this juror has [*sic*] nothing to do with race, absolutely nothing to do with race. Some of the answers that she has given as it relates to damages and other information, not in the least of which has anything to do with her color, but it is her thinking process especially with the damage issue that has led me to go ahead and excuse her. I don't have the same belief for juror number 2 who is—

"THE COURT: I don't want to talk about anybody else. Motion will be denied."

Appellants' argument regarding appellee's peremptory challenge to remove Juror Number 7 from the venire is *not* that appellee's exercise of its peremptory challenge constituted racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Rather, appellants' argument is that the trial court committed reversible error because it did not conduct the proper constitutional analysis in determining that appellee St. Alexis Hospital was not racially motivated in excluding an African American from the jury through the use of a peremptory challenge. We agree.

In *Hicks v. Westinghouse Materials Co.* (1997), 78 Ohio St.3d 95, 98–99, 676 N.E.2d 872, 876–877, the Supreme Court of Ohio set forth the relevant analysis for determining whether a peremptory challenge is racially motivated. The Ohio Supreme Court stated:

■ "The United States Supreme Court set forth in *Batson* [*v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69] the test to be used in determining whether a peremptory strike is racially motivated. First, a party opposing a peremptory challenge must demonstrate a prima-facie case of racial discrimination in the use of the strike. *Id.* at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87. To establish a prima-facie case, a litigant must show he or she is a member of a cognizable racial group and that the peremptory challenge will remove a member of the litigant's race from the venire. The peremptory-challenge opponent is entitled to rely on the fact that the strike is an inherently 'discriminating' device, permitting ' "those to discriminate who are of a mind to discriminate." ' *State v. Hernandez* (1992), 63 Ohio St.3d 577, 582 [589 N.E.2d 1310, 1313–1314], certiorari denied (1992), 506 U.S. 898, 113 S.Ct. 279, 121 L.Ed.2d 206. The litigant must then show an inference or inferences of racial discrimination by the striking party. The trial court should consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present. See *Batson* at 97–97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

■ "Assuming a prima-facie case exists, the striking party must then articulate a race-neutral explanation 'related to the particular case to be tried.' *Id.* at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88. A simple affirmation of general good faith will not suffice. However, the explanation 'need not rise to the level justifying exercise of a challenge for cause.' *Id.* at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. The critical issue is whether discriminatory intent is inherent in counsel's explanation for use of the strike; intent is present if the explanation is merely a pretext for exclusion on the basis of race. *Hernandez v. New York* (1991), 500 U.S. 352, 363, 111 S.Ct. 1859, 1868, 114 L.Ed.2d 395, 408.

■ "Last, the court must determine whether the party opposing the peremptory strike has proved purposeful discrimination. *Purkett v. Elem* (1995), 514 U.S. 765, 767, 115 S.Ct. 1769, 1770, 131 L.Ed.2d 834, 839. The critical question, which the trial judge must resolve, is whether counsel's race-neutral explanation should be believed. *Hernandez v. New York*, 500 U.S. at 365, 111 S.Ct. at 1869, 114 L.Ed.2d at 409. It is at this stage that the persuasiveness, and credibility, of the justification offered by the striking party becomes relevant. *Id.* at 768, 115 S.Ct. at 1771, 131 L.Ed.2d at 839. The critical question, which the trial judge must resolve, is whether counsel's race-neutral explanation should be believed. *Hernandez v. New York*, 500 U.S. at 365, 111 S.Ct. at 1869, 114 L.Ed.2d at 409.

■ "* * * *Trial judges must exercise considerable care in reviewing a claim of racial discrimination in jury selection. A judge should make clear, on the*

*record, that he or she understands and has applied the precise Batson test when racial discrimination has been alleged in opposition to a peremptory challenge."* (Emphasis added.)

In *Hicks, supra,* at 99, 102, 676 N.E.2d at 876–877, 878, the Ohio Supreme Court also set forth the standard for appellate review of such claims:

 "* * * [T]he duty of the trial court is to decide whether granting the strike will contaminate jury selection through unconstitutional means. Therefore, in analyzing the trial court's actions here, we must determine whether the trial judge's analysis of the contested peremptory strike was sufficient to preserve a constitutionally permissible jury-selection process.

"* * *

 "Review of a *Batson* claim largely hinges on issues of credibility. Accordingly, we ordinarily defer to the findings of the trial court. See *Batson* at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21. Whether a party intended to racially discriminate in challenging potential jurors is a question of fact, and in the absence of clear error, we will not reverse the trial court's determination. *Hernandez v. New York,* 500 U.S. at 369, 111 S.Ct. at 1871, 114 L.Ed.2d at 412; *State v. Hernandez,* 63 Ohio St.3d at 583, 589 N.E.2d at 1314."

In this case, it is apparent from the record that the trial judge did not properly apply the *Batson* test to appellants' allegation of racial discrimination in opposition to appellee's peremptory challenge.

 Initially, we note that appellee's argument that appellants failed to establish a prima-facie case of racial discrimination in appellee's use of the strike is without merit. In *Hicks,* for example, the Ohio Supreme Court found that although appellant's prima-facie case was "tenuous," the relevant circumstances surrounding the lower court proceeding were "largely devoid of any meaningful events that might have supported an inference of discriminatory purpose," and there was no "pattern of strikes" against African-American jurors, "[n]onetheless, the trial judge directed appellees' counsel to explain their reasons for the peremptory strike, thereby accepting appellant's prima-facie argument." *Id.* at 100, 676 N.E.2d at 877. Similarly, here, by asking defense counsel to state its reasons for its peremptory challenge, the trial court accepted appellants' prima-facie argument. Accordingly, pursuant to *Batson* and *Hicks,* defense counsel was required to articulate a "race-neutral explanation" for the strike.

 Although counsel began to explain appellee's reason for its use of the peremptory strike, however, the trial court interrupted counsel before he had concluded his explanation, declaring that appellants' motion would be denied. The trial court's action is troubling for several reasons. First, the trial court's

abrupt interruption of defense counsel and immediate ruling upon appellants' objection before counsel had set forth all of his reasons for striking Juror Number 7 does not evince the "considerable care in reviewing a claim of racial discrimination in jury selection" that the Supreme Court of Ohio has stated is necessary. *Hicks, supra,* at 99, 676 N.E.2d at 877.

Moreover, without more, counsel's explanation that appellee was striking Juror Number 7 because of her "answers * * * as it relates to damages and other information" is clearly insufficient to establish a race-neutral explanation for striking her from the jury. The only question regarding damages asked of Juror Number 7 was whether she could make an award based upon the evidence without regard to any cap or limitation to the damages. Juror Number 7's response—"I feel the same way, there shouldn't be a cap"—was a correct statement of the law: there is no cap on damages. Moreover, St. Alexis Hospital did not attempt to strike other, white jurors who had answered the question regarding caps the same way as Juror Number 7. Therefore, the trial court's decision to allow St. Alexis Hospital to exclude Juror Number 7 solely on the basis of her answer with respect to damages is highly suspect.

Presumably, St. Alexis Hospital had other nonrace-based reasons for excluding Juror Number 7—reasons that counsel would have explained if given the opportunity. Indeed, appellee contends that the trial court, like defense counsel, observed and weighed the inflection in Juror Number 7's voice when she answered questions and her general demeanor and, accordingly, "no doubt understood defense counsel's nonrace-based rationale for excluding her from the jury." There is no indication of that in the record, however. If, in fact, defense counsel's reason for striking Juror Number 7 was based upon her inflection and demeanor, counsel should have so stated for the record. More important, the trial court should have given defense counsel an opportunity to set forth all of his reasons for striking Juror Number 7 on the record and, then, carefully and thoughtfully evaluated those reasons on the record before ruling on appellants' objection. By failing to do so, the trial court failed to properly apply the four-part *Batson* test to appellants' challenge.

We acknowledge that it is unlikely that appellee was attempting to strike Juror Number 7 on the basis of her race. The record reflects that St. Alexis Hospital used only two of its three peremptory challenges to excuse prospective jurors. Moreover, three of the eight jurors on the final jury were black. The trial court's abbreviated consideration of appellants' challenge to the contested peremptory strike, however, was grossly insufficient to indicate that the judge "under[stood] and has applied the precise *Batson* test" to adequately "preserve [appellants' right to] a constitutionally permissible jury-selection process." *Hicks, supra,* at 99, 676 N.E.2d at 877.

Accordingly, appellants' first assignment of error is sustained.

Appellants' second assignment of error states:

"II. The trial court committed prejudicial error in allowing testimony of defense expert David Longworth, M.D. over plaintiffs' objection."

In their second assignment of error, appellants contend that the trial court committed reversible error in allowing Dr. David Longworth to provide expert testimony regarding proximate cause at trial because his opinion was not held with the requisite degree of certainty.

In his written report to defense counsel regarding the treatment rendered to Mattie Cunningham at St. Alexis Hospital Medical Center, Dr. Longworth, who is Chairman of the Department of Infectious Disease at The Cleveland Clinic Foundation, stated:

"With regard to your specific questions concerning the appropriateness of medical therapy, my responses are as follows:

"* * *

"2. *I have no definitive opinion regarding whether administration of antibiotics in the Emergency Room would have ultimately altered her clinical course.* * * *

"3. *I cannot state at what point early administration of antibiotic therapy would have altered the ultimate clinical course.*" (Emphasis added.)

At his subsequent videotaped trial deposition, Dr. Longworth was asked the following question by defense counsel:

"Do you have an opinion, sir, which you can state with a reasonable medical certainty as to whether or not if a single dose of broad-spectrum antibiotic had hypothetically been ordered by Dr. Mounajjed while the patient was under his care in the emergency room, that such would have prevented the loss of Mattie Cunningham's legs, do you have an opinion?"

Appellants' counsel objected to the question because Dr. Longworth had stated in his written report that he had no opinion regarding whether the administration of antibiotics in the Emergency Room would have altered the course of Mattie Cunningham's treatment. Nevertheless, Dr. Longworth answered the question:

"*I do not have an opinion with 51 percent medical certainty, but I do not believe that a single dose would have altered the clinical course.*" (Emphasis added.)

Prior to the presentation of Dr. Longworth's videotaped deposition to the jury, appellants' counsel requested that the trial court exclude Dr. Longworth's answer to defense counsel's question regarding whether a single dose of antibiotics

administered in the Emergency Room would have altered the course of Mattie Cunningham's treatment. The trial judge overruled appellants' motion and the jury heard Dr. Longworth's answer.

An expert opinion is competent only if it is held to a reasonable degree of scientific certainty. *State v. Benner* (1988), 40 Ohio St.3d 301, 313, 533 N.E.2d 701, 713–714. In this context, "reasonable certainty" means "probability." *Id.* Thus, an expert must state his or her opinion in terms of probability, meaning that he or she must express that there is a greater than fifty-percent likelihood that a certain act or failure to act caused a given result. *Stinson v. England* (1994), 69 Ohio St.3d 451, 455, 633 N.E.2d 532, 537.

Here, Dr. Longworth candidly admitted that he did not hold an opinion regarding whether a single dose of antibiotic administered to Mattie Cunningham in the Emergency Room of St. Alexis Hospital Medical Center would have altered the clinical outcome of Mattie Cunningham to the requisite degree of certainty. Accordingly, it was error for the trial court to admit his testimony regarding this issue on behalf of 4M and Dr. Mounajjed.

Appellee St. Alexis Hospital concedes that the trial court erred in allowing Dr. Longworth to offer such proximate cause testimony at trial, but contends that the error was harmless because it was cumulative of other testimony presented at trial. Specifically, appellee asserts that Dr. Lowell Young, the hospital's expert, opined to a medical certainty that a single dose of broad-spectrum antibiotics would not have changed Cunningham's outcome. Therefore, St. Alexis Hospital contends that even if the trial court should have excluded Dr. Longworth's testimony, the jury could have relied on Dr. Young's testimony regarding proximate cause.

St. Alexis relies on *Hurst v. Poelstra* (Dec. 22, 1995), Miami App. No. 94–CA–61, unreported, 1995 WL 765968, in support of its argument. In *Hurst*, a medical malpractice case, the defendant doctor asserted on appeal that the plaintiff's use at trial of the discovery deposition of an expert the defense ultimately decided not to call at trial was reversible error. The Second Appellate District Court disagreed, finding that the testimony offered in the discovery deposition was established through the testimony of the plaintiff's other experts, was not disputed by the defendant doctor or his expert and, most important, did not address the ultimate question of whether the defendant fell below the standard of care in his diagnosis and treatment of the plaintiff. Accordingly, the appellate court concluded that the trial court's error in allowing the plaintiff to use the expert's discovery deposition at trial was harmless.

This case, however, is not like *Hurst*. The main thrust of appellants' argument at trial was that a single dose of broad-spectrum antibiotics would have altered

Cunningham's clinical outcome. Appellants' expert, Dr. Keith Cartwright, testified that two grams of antibiotics, given anytime before 1:00 p.m. on June 13, 1996, would have killed every bacteria in Cunningham's bloodstream and prevented her limb loss. Thus, Dr. Longworth's testimony that he did "not believe that a single dose would have altered the clinical course" went directly to the ultimate question of proximate cause. Moreover, his testimony was highly disputed by appellants. Accordingly, we cannot find his testimony harmless.

We find the arguments of appellees 4M Emergency Systems, Inc. and Dr. Mounajjed with respect to Dr. Longworth's testimony similarly unpersuasive.[2] These appellees assert that because Dr. Longworth "candidly admitted that his opinion was not based on 51% medical certainty," his statement "was not offered as true proximate cause testimony," Appellees also assert that because the jury rendered a verdict in favor of appellees with respect to negligence, the jury never considered the issue of proximate cause and, therefore, Dr. Longworth's testimony did not prejudice the jury.

We fail to understand how Dr. Longworth's candid acknowledgment that he did not hold his opinion with a fifty-one percent certainty somehow transformed his statement into something other than testimony regarding proximate cause. In the eyes of the jury, the testimony of Dr. Longworth, Chairman of the Department of Infectious Disease at The Cleveland Clinic Foundation, was indeed "true" proximate cause testimony. Moreover, it is apparent that the jury considered the issue of proximate cause. Indeed, the note sent to the trial judge by the jury foreperson after two days of deliberation indicated that the jury had discussed the issue of proximate cause at length and was stalemated on that issue. In light of the jury's stalemate on this issue, it is obvious that the trial court's error in allowing Dr. Longworth to testify regarding proximate cause was not harmless error.

We hold, therefore, that pursuant to *Stinson, supra,* it was error for the trial court to permit Dr. Longworth to testify with respect to proximate cause. Appellants' second assignment of error is therefore sustained.

Appellants' third assignment of error states:

"III. The trial court committed prejudicial error in allowing the testimony of defense expert Arthur Wheeler, M.D., over plaintiffs' objection."

In their third assignment of error, appellants assert that the trial court abused its discretion in allowing Arthur Wheeler, M.D., to testify as an expert on behalf of appellee Dr. Mehta at trial because Dr. Wheeler does not devote enough of his time to the active clinical practice of medicine as required by Ohio Evid.R. 601.

---

2. Dr. Mehta does not address this assignment of error.

Evid.R. 601(D) states:

"Every person is competent to be a witness except:

"* * *

"(D) A person giving expert testimony on the issue of liability in any claim asserted in any civil action against a physician, podiatrist, or hospital arising out of the diagnosis, care, or treatment of any person by a physician or podiatrist, unless the person testifying is licensed to practice medicine and surgery, osteopathic medicine and surgery, or podiatric medicine and surgery by the state medical board or by the licensing authority of any state, *and unless the person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure,* or to its instruction in an accredited school * * *." (Emphasis added.)

At his discovery deposition three weeks prior to trial, Dr. Wheeler testified as follows:

"Q. Okay. What are your duties here at Vanderbilt?

"A. I have three basic duties. One is to provide patient care, the second is to teach medical students, fellows and residents, and the third is to do research.

"Q. Can you tell me about how much of your professional time you devote to each of those activities?

"A. Approximately two-thirds to seventy-five percent of my time is spent doing research, with the balance of the majority spent in patient care."

Prior to trial, appellants filed a motion *in limine* based on Dr. Wheeler's deposition testimony to preclude him from testifying regarding the standard of care. Appellants' counsel reminded the trial court immediately before trial commenced that their motion was still pending; the trial judge informed counsel that he was reserving ruling on the motion.

On the second day of trial, before the jury was sworn, the trial judge informed counsel that appellants' motion *in limine* was granted. Counsel for Dr. Mehta then pleaded with the court to give him more time to produce an affidavit from Dr. Wheeler explaining his deposition testimony. Accordingly, the trial court reversed its ruling and granted appellee more time. Dr. Wheeler subsequently submitted an affidavit which in its entirety stated:

"1. I am duly licensed to practice medicine in the State of Tennessee, and am in good standing.

"2. I am Board Certified in the practice of Internal Medicine, with subspecialty in Critical Care Medicine, and Pulmonary Medicine.

"3. A true copy of my Curriculum Vitae is attached as Exhibit A to this affidavit.

"4. I spend 65% of my time in the active practice of clinical medicine and/or teaching at the Vanderbilt University Medical School.

"5. I am familiar with the standards of care for the practice of Internal Medicine including Critical Care and Pulmonary medicine."

Before Dr. Young and Dr. Wheeler took the stand, appellants again noted their objection on the record:

"Note an objection to this witness, Lowell Young, testifying *and Dr. Wheeler* testifying because they are not qualified under the statute."

After the objection, counsel met in chambers and the following discussion took place on the record:

"MR. SANDEL: I am objecting to Dr. Young testifying as he is a researcher. He does not practice medicine. He does not see patients except occasionally in his own capacity as a director of a research lab. * * * He does not meet the test of the State of Ohio to be involved fifty percent in clinical practice of medicine and/or teaching at an accredited institution.

"*And, Dr. Wheeler, we've already objected to in that he testified he spends two-thirds of his professional time involved in research.* He also does not meet the statutory test of being fifty percent of his time in the active clinical practice of medicine and/or teaching." (Emphasis added.)

Counsel for St. Alexis Hospital then presented its arguments on behalf of Dr. Young and the trial court ruled that Dr. Young would be allowed to testify: "Everybody fudges in this business. I'm going to let him testify."

Although the record does not reflect a subsequent ruling denying appellants' motion *in limine* with respect to Dr. Wheeler, he testified at trial as follows regarding his competency to testify as to the standard of care:

"Q. What is the total percentage of your time spent in teaching and active clinical care of your patients?

"A. That's a difficult question to answer because my research is clinical research. I'm seeing patients and trying to develop new treatments with patients with sepsis and ARDS. It's very difficult to separate research from patient care. My research would involve being at the bedside, taking care of critically ill patients with new therapy.

"Q. Sir, if we were to combine your care of patients and teaching assignments, would that exceed fifty percent of your time?

"A. Certainly more than fifty percent."

As an initial matter, we reject appellee Dr. Mehta's disingenuous assertion that appellants failed to preserve any objection to Dr. Wheeler's competency to testify as to the standard of care by not raising a timely objection on the record at trial when Dr. Wheeler was called to testify. As set forth above, the record is replete with appellants' objections regarding Dr. Wheeler's competency to provide expert testimony on the standard of care.

Dr. Mehta asserts, however, that even if the issue was not waived, the trial court did not abuse its discretion in allowing Dr. Wheeler to testify as to the standard of care because Dr. Wheeler was competent to testify.

In *McCrory v. State* (1981), 67 Ohio St.2d 99, 104, 21 O.O.3d 63, 66, 423 N.E.2d 156, 160, the Ohio Supreme Court held that the phrase "active clinical practice" includes not only those physicians who spend their professional time treating patients but also encompasses the physician-specialist whose work is "so related or adjunctive to patient care as to be necessarily included in that definition for the purpose of determining fault or liability in a medical claim." *Id.* Applying that definition, the court held that a doctor who spent eighty-five percent of his time as the director of a clinical research department for a pharmaceutical company was competent to testify as an expert.

Dr. Mehta argues pursuant to *McCrory, supra,* that Dr. Wheeler's trial testimony verifies the fact that his clinical research, teaching, and patient care are intertwined such that his combined care of patients and teaching assignments exceeds fifty percent of his time and, therefore, he was competent to testify regarding the standard of care.

Appellants argue, however, that Dr. Wheeler was given the opportunity by the trial court to "fudge" his testimony so as to meet the qualifications for providing expert testimony under the parameters of Evid.R. 601(D). We agree.

Dr. Wheeler testified unequivocally in his discovery deposition taken shortly before trial that he spent approximately two-thirds to seventy-five percent of his time doing research, with the balance spent in patient care. Based upon this testimony, Dr. Wheeler was not competent to provide expert testimony under Evid.R. 601(D). The trial court should not have allowed Dr. Wheeler to conform his testimony so as to meet the competency standards.

Moreover, Dr. Wheeler's affidavit does nothing to explain his involvement with research and patient care or how his research "is so related or integral to patient care" as to be included in the definition of "active clinical practice." Rather, it merely contradicts his deposition testimony.

The determination of whether a medical witness is competent to testify as an expert lies within the sound discretion of the trial judge and rulings with

respect to such matters will not be reversed unless there is a clear showing that the court abused its discretion. *McCrory, supra.* On this record, we hold that the trial court abused its discretion in finding Dr. Wheeler competent to testify as to the standard of care.

Appellants' third assignment of error is sustained.

Appellants' fourth assignment of error states:

"IV. The trial court committed prejudicial error during jury deliberations."

On its second day of deliberations, the jury presented two notes to the trial court. One note, prepared by the jury foreperson, read:

"Judge Feighan,

"We have discussed the issue of St. Alexis Hospital Medical Center being the proximate cause of the plaintiff's damage or injury for 6 hrs. and we are at a stalemate. How do we proceed? 4–No; 2–Yes; 2–Undecided.

"Carol Young, Juror No. 1"

The second note was from Juror Number 3, Jesse McMickens. His note read:

"Judge,

"I would like to report some juror misconduct.

"Juror No. 3"

Upon receipt of these questions, the trial judge summoned counsel, who agreed that the judge would write "Continue your deliberations" on the first note and return the note to the jury foreperson. With respect to the second note, counsel agreed that the trial judge would individually *voir dire* McMickens on the record to explore the nature of his concern and to evaluate what steps would be appropriate in response thereto.

The record reflects the following exchange:

"THE COURT: You sent me a note, 'Judge, I would like to report some juror misconduct.'

"MR. McMICKENS: Yes, sir.

"THE COURT: Is that a fact?

"MR. McMICKENS: Yes, sir.

"THE COURT: Say whatever you have to say on the record.

"MR. McMICKENS: You had told us we only supposed to discuss what was said from this witness stand. That's all we supposed to be discussing. That's all we had to go on. And they discussed—

"THE COURT: Well, the exhibits, also.

"MR. McMICKENS: And the exhibits which you gave us. Then they started discussing Mr. Sandel. One guy told me, 'I'm not going to let Jesse give no $500,000 and Sandel will get half of it because you know he gets a half of that money.'

*"And then this lady that's a nurse, she be using her job experience all the while. And you told her not to do that. She be using her whole job ever since Wednesday.*

"THE COURT: Well, she brings with her all her life experiences.

"MR. McMICKENS: Yes, but she was talking about stuff like, well, the way it is did on the job, her job, like that. You're not supposed to do that because we're not talking about her job. It wasn't her job. We are talking about the facts of the case, everything that was presented on the stand. That's all we can go by.

"Then they start talking about Dr. Dar and they said Dr. Dar, we should—he should be in jail. We don't even know how much he settled for. We should know because he the one who did it, and we don't know how much he settled for. And they was basing their decision on that. If he had been to the hospital, then she wouldn't have had it, but since he wasn't at the hospital, since he didn't show up, that's why she like that. They was all piled up on Dr. Dar and not going on the information they had.

"THE COURT: Mr. McMickens, the jury deliberation is a tough process.

"MR. McMICKENS: I know it is.

"THE COURT: A tougher process than people realize until they get in it. And this is a difficult case for everybody, a lengthy case, tremendous amount of evidence.

"MR. McMICKENS: It was.

"THE COURT: Will you continue your deliberations and do your best that you can to arrive at a just verdict?

"MR. McMICKENS: I really don't even want to fool around.

"THE COURT: What?

"MR. McMICKENS: I don't want to fool with it no more. We discussed it and they discussed it and they using the wrong criteria. They are not discussing the facts. They are discussing stuff that wasn't said on the stand. They trying to make it look like

"— they trying to find a reason for everything. They say, well, we don't know that. We don't know that. We don't know that happened. It's in the record that it happened.

"THE COURT: Okay.

"MR. McMICKENS: This guy, he seemed to be against defense attorneys. They going to get ahead for it. It is not our business what he get. It's not our business. He don't want to give her no money because he don't want to give him half of it.

"THE COURT: Okay. Thank you very much.

"MR. McMICKENS: Yes, sir."

After McMickens returned to the jury room, the trial judge had the following discussion with counsel:

"MR. SANDEL: Our position is that we want a jury of eight to decide this case, and we are asking the court to replace any jurors who have engaged in misconduct with an alternate juror, whoever the court deems has engaged in misconduct.

"We are also asking the court to reinstruct the jury that they are not to consider evidence *aliunde,* that they are only to consider the evidence in this case in reaching a verdict and not evidence outside of this case from their own experience.

"MR. BONEZZI: On behalf of St. Alexis Medical Center, the court has the right to dismiss a juror and that if in fact that happens for misconduct or other reasons, then a lesser number is necessary or required to reach a verdict, and in this case, if one was dismissed to bring the total number down to seven, then five would be necessary to go ahead and reach a verdict. I do not believe under any circumstances that any alternate juror can be brought back into this case for purposes of deliberating. They have already been dismissed. This jury has been deliberating for approximately two days.

"THE COURT: Further, the alternates were dismissed before the charge so they have not been charged.

"MR. BONEZZI: And on behalf of St. Alexis Medical Center, I object to recharging this jury as requested by plaintiffs' counsel.

"MR. GOLDWASSER: I, on behalf of Dr. Mounajjed and 4M Emergency Systems, merely reiterate that which has just been stated by Mr. Bonezzi.

"MR. RISPO: And on behalf of Mr. Mehta, I would adopt and join in the previous motions.

"THE COURT: The court has a problem whether I find Juror Number 3 guilty of misconduct.

"MR. SANDEL: He isn't saying he is guilty of misconduct. He is saying another juror is guilty of misconduct.

"MR. BONEZZI: Except Juror Number 3 has also indicated that he will not participate in any further deliberations.

"THE COURT: He said he didn't want to. Is there anything that we find in here with regard to juror misconduct permitting their removal by the court? I'm sure there have been cases on juror misconduct.

"MR. SANDEL: Let the record reflect that there is no allegation of juror misconduct on the part of Juror Number 3, rather Juror Number 3 alleges misconduct on the part of another juror unnamed.

"THE COURT: Well, the forelady indicated to me this morning, as I related to you, gentleman, you know—

"MR. RISPO: I didn't hear that.

"MR. GOLDWASSER: The forelady contends that there is a racial problem. Is that what you were told? As expressed by Juror Number 3.

"THE COURT: I can't find juror misconduct. I'm open to your suggestions, gentlemen. It is your case. You have more at stake than I do.

"MR. GOLDWASSER: Judge, on behalf of my clients, I ask the court to excuse Juror Number 3.

"MR. BONEZZI: On behalf of St. Alexis Medical Center, I also request that you excuse Juror Number 3.

"MR. RISPO: I join in the same request on behalf of Dr. Mehta.

"MR. SANDEL: On behalf of the plaintiff, there's no allegation of misconduct against this juror. He is just having difficulty with negotiations. On behalf of the plaintiff, I ask the court to discharge the juror whom he alleges to have been engaged in misconduct and to instruct the jury that they may not consider evidence *aliunde*, evidence other than what was presented in this case.

"THE COURT: We have another problem which just came back into my head, that one of the jurors, and I believe it might be Number 2, Barbara Robinson, or it may be Number 7, Milissa Glinsey. A black female stated to me that she had problems with Monday, that they had a vacation and—

"MR. GOLDWASSER: Problems with what?

"MR. BONEZZI: Time.

"THE COURT: Time. Time. Time.

"MR. BONEZZI: If they can't reach a verdict today and they can't come back Monday—

"MR. GOLDWASSER: Well, with all due respect, I don't think they have a choice, Judge. I think they have an obligation to deliberate either tonight or tomorrow.

"MR. RISPO: They can deliberate tomorrow.

"THE COURT: As the way things go, it's extremely difficult to require a jury to deliberate full days. It's not like sitting in a trial where you can sleep. You may sleep in the deliberating room, but it's much more stressful as we see.

"MR. GOLDWASSER: Judge, we said to this jury, all the lawyers commented that they got the toughest job here, but that's the way it is.

"THE COURT: It's my position that as things stand now, I'm going to return the note from the foreman with the answer, 'Continue your deliberations.' I'm not going to do anything with reference to Juror Number 3 until such time as something else pops up.

"MR. GOLDWASSER: All right.

"MR. SANDEL: Are you going to instruct the jury they're not instructed to—

"THE COURT: I'm not going to give them any more instructions."

In their fourth assignment of error, appellants contend that the trial court erred in (1) not conducting an investigation into alleged juror misconduct after the court had notice of possible misconduct, (2) not providing a necessary curative instruction to the jury after the issue of possible juror misconduct was raised, and (3) not declaring a mistrial because Juror McMickens informed the court that he was not willing to deliberate any further.

As a reviewing court, we show deference to the trial judge, who sees and hears the events and thus is in a better position to accurately evaluate the situation and determine the appropriate scope of inquiry. *State v. Hessler* (2000), 90 Ohio St.3d 108, 115–116, 734 N.E.2d 1237, 1246–1247. Therefore, we employ an abuse-of-discretion standard and will not reverse the trial court unless it has handled the alleged juror misconduct in an "unreasonable, arbitrary, or unconscionable" manner. *Id.* at 116, 734 N.E.2d at 1247, citing *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172–173, 404 N.E.2d 144, 148–149.

Initially, we note that appellants waived any argument that the trial court erred in not declaring a mistrial because Juror McMickens informed the court that he did not want to deliberate any further. The record clearly demonstrates that appellants did not request a mistrial on the basis of McMickens's statement. Rather, appellants' counsel stated several times that McMickens had not engaged in any juror misconduct and, further, argued for keeping McMickens on the jury. Accordingly, appellants waived this argument on appeal.

See *Shover v. Cordis Corp.* (1991), 61 Ohio St.3d 213, 220, 574 N.E.2d 457, 462–463. Appellants' remaining arguments, however, have merit.

The United States Supreme Court has repeatedly held in a wide variety of contexts that the right to be tried before a jury capable and willing to decide a case solely on the evidence before it is a cornerstone of our justice system. *McIlwain v. United States* (1983), 464 U.S. 972, 104 S.Ct. 409, 78 L.Ed.2d 349. "This precious right is denigrated when a [judgment] resting upon deliberations tainted by a juror's * * * impropriety is allowed to stand." *Id.*

In addition, the Ohio Supreme Court has noted that Section 5, Article I of the Ohio Constitution guarantees the right to a trial by jury, and this right "carries with it by necessary implication the right to trial by a jury composed of unbiased and unprejudiced jurors." *State v. Hessler* (2000), 90 Ohio St.3d 108, 133, 734 N.E.2d 1237, 1259, quoting *Lingafelter v. Moore* (1917), 95 Ohio St. 384, 117 N.E. 16, paragraph one of the syllabus. Similarly, this court has noted that "[o]ne touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case solely on the evidence before it.'" *Apaydin v. Cleveland Clinic Found.* (1995), 105 Ohio App.3d 149, 154, 663 N.E.2d 745, 748–749, quoting *McDonough Power Equip., Inc. v. Greenwood* (1993), 464 U.S. 548, 554, 104 S.Ct. 845, 849, 78 L.Ed.2d 663, 670.

Here, the trial judge became aware of the possibility of juror misconduct before any verdict had been reached by the jury. "[J]urors are observable by each other, and may report inappropriate juror behavior to the court before they render a verdict." *Tanner v. United States* (1987), 483 U.S. 107, 127, 107 S.Ct. 2739, 2751, 97 L.Ed.2d 90, 110. After learning of alleged juror misconduct from Juror McMickens, however, the trial court took no steps to safeguard appellants' right to trial by a jury of unbiased and unprejudiced jurors willing to decide the case solely on the evidence presented to it.

The question presented to the trial court by McMickens's allegation of juror misconduct was whether extraneous evidence had so prejudiced jury consideration of the issues as to prevent the jurors from impartially deciding the case. At a minimum, therefore, the trial court should have suspended jury deliberations and questioned the juror accused of misconduct to determine whether she was, in fact, introducing extraneous evidence into the jury deliberation process. If the trial judge determined that the unnamed juror was doing so, he should have then questioned all of the other jurors separately to determine the effect of the juror's statements on the jury deliberations and whether the other jurors remained impartial. See *State v. Robb* (2000), 88 Ohio St.3d 59, 78–82, 723 N.E.2d 1019, 1042–1045.

Appellees 4M Emergency Systems, Inc. and Dr. Mounajjed, however, in reliance on *State v. Hessler* (2000), 90 Ohio St.3d 108, 734 N.E.2d 1237, argue that the trial judge was not required to question the unnamed juror or any of the other jurors. In *Hessler,* the jury convicted the defendant of aggravated murder, burglary, and improperly discharging a firearm. After completing penalty deliberations, the jury reported that it had made its sentencing recommendations. The judge assembled the attorneys and defendant in the courtroom and then asked if there was anything further before he brought the jury back into the courtroom. At that point, the bailiff informed the judge that there was a distraught juror in the hallway. The attorneys agreed that the judge would question the juror to find out the problem.

The judge then questioned the juror on the record. The juror indicated that she was upset and unnerved by the deliberations and could not return to the courtroom. The juror also stated that she "[did] not agree with any of the people in there" and questioned the judge regarding what would happen if she disagreed in the courtroom with the jury's recommendation. The judge attempted to calm the juror, reminded her of the importance of the proceeding and her part in it, and assured her that there was no pressure to vote a certain way. The jury was then brought back into the courtroom and its decision was announced. When individually polled, the juror stated that she agreed with the recommendations.

On appeal, the defendant argued that he was denied the right to a fair and impartial jury because of juror misconduct. The Supreme Court of Ohio, however, found that the juror "exercised her free will" in "agree[ing] with the sentencing recommendations" announced in court and, therefore, there was no juror misconduct. *Id.* at 121, 734 N.E.2d at 1250.

The Supreme Court rejected the defendant's contention that the trial court was required to hold an evidentiary hearing into the matter pursuant to *Remmer v. United States* (1954), 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654. The Supreme Court stated:

"In *Remmer,* the Supreme Court held that when improper contacts with a jury are discovered by the parties after the verdict, the trial court must conduct a hearing to determine the effect of those contacts. However, more recent cases have determined that the complaining party must show actual prejudice. See *Smith v. Phillips* (1982), 455 U.S. 209, 215 [102 S.Ct. 940, 944–945, 71 L.Ed.2d 78, 85]; *United States v. Olano* (1993), 507 U.S. 725, 738 [113 S.Ct. 1770, 1780, 123 L.Ed.2d 508, 522]; *United States v. Sylvester* (C.A.5, 1998), 143 F.3d 923.

"In this case, the court did not abuse its discretion in interviewing this juror as it did in order to make sure that she understood that the choice was hers and hers alone. No further *Remmer* hearing was required. The parties knew about the communications between the court and the juror before they occurred, and

did not suddenly discover them after the trial. Moreover, appellant never asked to question the juror before the sentence recommendations were announced, nor immediately thereafter. The lack of prejudice to appellant is manifest. The discussion at issue was recorded, and occurred after the jury had already reached a decision and the juror had already signed the sentencing forms. * * * Since those deliberations had concluded, nothing said or done by the trial judge could have affected the deliberations." (Citations omitted.)

Appellees assert that, as in *Hessler*, the trial judge in this case had no obligation to *voir dire* any of the other jurors because he interviewed Juror McMickens and determined that there was no juror misconduct. Further, they argue that an evidentiary hearing is required only when the party complaining of juror misconduct can show actual prejudice and appellants have not done so. We disagree. Under the facts of this case, the fundamental right to trial by a fair and unbiased jury required further inquiry by the trial judge into the conduct of the jurors during deliberations.

Juror McMickens's allegations were substantial and raised the specter that any one of several jurors on the panel[3] could have been engaged in misconduct by informing the jury of her job experience and suggesting that the jury judge appellees' actions on her hospital experience rather than on the evidence presented at trial. The trial court, however, failed to determine whether there was, in fact, any juror misconduct. Although the trial judge proclaimed "I can't find juror misconduct," the record is devoid of *any* attempt to look for it after the issue was raised by Juror McMickens. Consequently, there is nothing in the record to support the trial court's determination that there was no juror misconduct.

Moreover, the trial court failed to determine if any of the jurors were tainted or in any way biased by the alleged extraneous information brought to the attention of the jury by the unnamed juror. The trial court's failure to make this determination makes it impossible for appellants to ascertain, much less demonstrate, whether or not they were actually prejudiced by the alleged juror misconduct.

Appellee St. Alexis Hospital argues, however, that there was no juror misconduct in this case because jurors are allowed to share their general knowledge based upon their differing backgrounds and experiences. Although that may be true, McMickens's allegation was that an unnamed juror was sharing much more than her general knowledge and work experience: she was telling the jury what the standard of care was in this case based upon her job experience.

---

3. There were four nurses on the jury.

We recognize that the line between the common knowledge jurors are expected to bring to the deliberative process and extraneous influences is often very thin. See, *e.g.*, *Gault v. Poor Sisters of St. Frances Seraph of the Perpetual Adoration, Inc.* (C.A.6, 1967), 375 F.2d 539. If McMickens's allegation were true, however, the extraneous information brought to the attention of the jury could have had a negative impact on the jury and how it viewed appellants and their theory. McMickens' allegation raised the possibility of adverse effects by the unnamed juror's statements upon appellants' substantive right to a fair and impartial jury. Without any inquiry by the trial court into what the unnamed juror actually said and the effect of her statements on the other jurors, however, it is impossible to determine whether appellants' right to have the jury decide the case solely upon the evidence presented to it was violated.

Finally, contrary to appellees' argument, Evid.R. 606(B) is not applicable to the alleged juror misconduct in this case.[4] That rule, and the accompanying *aliunde* rule used to corroborate any attack on the verdict, applies to an instance of juror misconduct which is discovered *after* the verdict is reached by the jury. In this case, the jury had not yet reached a verdict. Accordingly, the trial judge should have conducted an inquiry of the particular juror accused of misconduct and the other jurors to determine whether appellants would receive a fair trial before eight impartial jurors willing to decide the case solely upon the evidence presented to it. The trial court abused its discretion in not doing so.

Appellants' fourth assignment of error is therefore sustained.

Our resolution of appellants' first, second, third, and fourth assignments of error renders their fifth and sixth assignments of error moot and therefore we need not consider them. See App.R. 12(A)(1)(c).

*Judgment reversed*
*and cause remanded.*

KARPINSKI, A.J., concurs.

MICHAEL J. CORRIGAN, J., dissents.

---

4. Evid.R. 606(B) provides:

"Upon an inquiry into the validity of a verdict * * *, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict * * * or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented."

MICHAEL J. CORRIGAN, Judge, dissenting.

I believe that none of the alleged errors occurring at trial constitutes a valid basis for reversing the verdict, and would affirm the jury verdict in its entirety.

## I

The majority finds error with the court's decision to deny appellant's *Batson* challenge because the court did not engage in enough consideration of the challenge to show that it understood and applied the correct test. This is a tenuous ground for reversal, inasmuch as the majority is forced to concede that appellant is not complaining on appeal that peremptory challenges were used in furtherance of purposeful racial discrimination. If there is no complaint that St. Alexis Hospital used a peremptory challenge to strike black jurors, any question regarding the court's handling of the *prima-facie* test would certainly be irrelevant to the question of purposeful discrimination *vel non.*

But even were I to apply "with considerable care" the *Batson prima-facie* test under *Hicks v. Westinghouse Materials Co.* (1997), 78 Ohio St.3d 95, 98–99, 676 N.E.2d 872, 876–877, my opinion that the court did not err by refusing to find purposeful discrimination in the strike would not change. The majority repeats the same error it finds the court made—it fails to apply the test to determine whether appellant made out a *prima-facie* case of exclusion on racial grounds.

The majority takes issue with St. Alexis' ground for striking Juror No. 7, finding it is "clearly insufficient" to establish a race-neutral explanation for the strike. However, the second part of the three part, burden-shifting test set forth in *Batson* does not require the party striking a juror to state "good" reasons for the strike at that point in the inquiry:

"It is not until the third step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett v. Elem* (1995), 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839.

The proponent of the strike need merely articulate a "legitimate" reason for the strike. *Id.* This does not mean that the reason must make sense—it might even be considered "implausible or fantastic" or "silly or superstitious." *Id.* Hence, in *Purkett,* the United States Supreme Court accepted as legitimately race-neutral strikes of two black males because they had long, curly, and unkempt hair.

Applying the proper analysis shows that the court could legitimately accept St. Alexis' reason for striking the juror as being race-neutral on its face. This being the case, the burden would have shifted to appellant to show that St. Alexis'

reason for striking the juror was pretext. The majority candidly concedes that appellant could not make that showing, noting that it is "unlikely" that St. Alexis used the peremptory to exclude a juror based on her race. The majority is correct to reach this conclusion, for three of the eight jurors seated for trial were black and St. Alexis used only two of its three peremptory challenges. This is not the kind of substantial disparity between struck jurors and those seated to establish an inference of discrimination. See, *e.g.*, *United States v. Alvarado* (C.A.2, 1991), 923 F.2d 253, 255 ("Only a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination.").

Because the majority concedes that there is ultimately no question of racial animus and recognizes the unassailable fact that appellant will not prevail on this point, its remand would serve no meaningful purpose.

## II

The majority next finds that the court erred by permitting David Longworth, M.D., to testify because he could not express an opinion concerning proximate causation. Appellant's theory at trial was that the hospital violated the standard of care by failing to give a single dose of antibiotic early enough to kill the infection that ravaged her. Longworth told the jury that he did not have an opinion, to the requisite degree of medical certainty, whether a single dose of antibiotics would have altered the course of the infection.

It does not matter that the court permitted Longworth's testimony because it went to the issue of proximate cause, and proximate cause became irrelevant in light of the jury's finding that no standard of care had been breached. The majority agrees that Longworth's testimony went to the "ultimate issue of proximate cause" but chooses to ignore the jury's ultimate finding relating to reasonable care, saying that a question the jurors sent to the court shows that they were still considering proximate causation two days after they began deliberating.

This is a *non sequitur*. Even if the jury considered proximate causation during its deliberations, it says nothing about the ultimate verdict that found that defendants did not breach a standard of care. We do not know why the jury reached the verdict it did, and it is not our job to "inquir[e] into a jury's thought processes * * *." See *United States v. Powell* (1984), 469 U.S. 57, 66–67, 105 S.Ct. 471, 477–478, 83 L.Ed.2d 461, 469–470. The verdict stands as it is, and a finding that there had been no breach of a standard of reasonable care would negate any consideration of proximate causation.

Even were proximate causation still at issue, I would find no error. The majority gives the impression that Longworth's testimony was the only defense evidence on proximate cause, but a second witness, Lowell Young, M.D., testified that the infection had irreversibly progressed to the point where antibiotics would not have altered the course of the infection. The majority notes the existence of this testimony, then proceeds to ignore it, choosing instead to focus solely on Longworth's testimony and its impact on the jury. Young expressed his opinion to the requisite degree of medical certainty, and his testimony clearly presented the fact issue of proximate cause. The presence of this second opinion completely undermines the majority's conclusion that the jury relied solely on Longworth's testimony to appellant's detriment.

## III

In upholding appellant's third assignment of error, the majority finds that Arthur Wheeler, M.D., did not devote enough of his time to the active clinical practice of medicine because he testified at deposition that approximately two-thirds to seventy-five percent of his time is spent doing research. In doing so, the majority gives no meaningful consideration to Wheeler's subsequent affidavit in which he stated that he devoted sixty-five percent of his time to the active practice of clinical medicine. It finds it sufficient to say that Wheeler's affidavit "merely contradicts his deposition testimony."

The court has the sole discretion to determine the competency of a witness, and the court did not abuse its discretion by finding that Wheeler's affidavit clarified certain aspects of his deposition testimony to make clear the scope of his clinical duties. At trial, Wheeler clarified that his research was part and parcel of his clinical practice of medicine: "My research would involve being at the bedside, taking care of critically ill patients with new therapy." Clarified in this manner, Wheeler's testimony dispelled any misunderstanding of his initial statements in deposition. Any discrepancies between the deposition testimony and affidavit ultimately went to Wheeler's credibility, and the court clearly resolved those credibility issues in Wheeler's favor.

Moreover, I disagree with the majority when it nit picks Wheeler's failure to explain in his affidavit how his research is related to the clinical practice of medicine. Wheeler's *curriculum vitae* fully outlined his impressive (and unchallenged) qualifications, and the jury was fully able to look at these qualifications and decide whether Wheeler's deposition testimony might not have accurately stated the nature of his practice. Moreover, the jury could properly assess Wheeler's credibility in light of the inconsistencies between his affidavit and deposition testimony. In my opinion, the majority finds no compelling reason to

show why the court's decision to permit Longworth's testimony was arbitrary, unreasonable, or capricious.

## IV

In its discussion of the fourth assignment of error, the majority finds that the court committed plain error by failing, on its own initiative, to *voir dire* a juror who had been accused by another juror of considering matters outside the evidence during deliberations. In reaching this finding, the majority cites the proper standard of review but then proceeds to ignore that standard.

There are no hard-and-fast rules for dealing with jury issues that arise during deliberations. Because trial judges are in a better position to review alleged claims of juror misconduct, we must apply an abuse-of-discretion standard and review the court's failure to question the individual juror to see whether the court's failure was unreasonable, arbitrary, or unconscionable. See *State v. Hessler* (2000), 90 Ohio St.3d 108, 115–116, 734 N.E.2d 1237, 1246–1247. When jury misconduct does occur, a new trial is not mandatory but will be ordered only when the juror misconduct has materially affected the substantial rights of the complaining party. *State v. Hipkins* (1982), 69 Ohio St.2d 80, 23 O.O.3d 123, 430 N.E.2d 943; *State v. Kehn* (1977), 50 Ohio St.2d 11, 19, 4 O.O.3d 74, 78–79, 361 N.E.2d 1330, 1335.

In *United States v. McVeigh* (C.A.10, 1998), 153 F.3d 1166, 1187, the Tenth Circuit Court of Appeals said:

" 'Courts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias during the course of a trial.' *United States v. Thomas,* 116 F.3d 606, 618 (2d Cir.1997). In determining whether the allegation is sufficiently serious to warrant a hearing, the district court must consider 'the content of the allegations, including the seriousness and likelihood of the alleged bias, and the credibility of the source.' *United States v. Jones,* 707 F.2d 1169, 1173 (10th Cir.1983) (citation omitted). Ultimately, the court must weigh the benefits of having a hearing, including the ability perhaps to ascertain more fully the extent and gravity of the possible prejudice, against the risks inherent in interrupting the trial and possibly placing undue emphasis on the challenged conduct. See [*United States v.*] *Bertoli,* 40 F.3d [1384] at 1395 [(3d Cir.1994)]; [*United States v.*] *Harris,* 908 F.2d [728] at 734 [(11th Cir.1990)]; *United States v. Chiantese,* 582 F.2d 974, 980 (5th Cir.1978)."

The Tenth Circuit went on to note that "intrajury misconduct generally has been regarded as less serious than extraneous influences on the jury." 153 F.3d at 1186. See, also, *United States v. DeLeon* (C.A.1, 1999), 187 F.3d 60, 67. This is not a case where a juror had been accused of learning information about the

trial from a source extraneous to the evidence presented at trial, so it cannot be considered a more serious case of alleged misconduct.

I can say that this is not a serious case of alleged misconduct, because all jurors have personal experiences that they take with them into the jury deliberation room and the courts do not expect those experiences to be cast aside during jury deliberations. In *United States v. Navarro–Garcia* (C.A.9, 1991), 926 F.2d 818, 821, the Ninth Circuit Court of Appeals said: .

"Inevitably, 'jurors must rely on their past personal experiences when hearing a trial and deliberating on a verdict.' *Hard v. Burlington No. RR*, 812 F.2d 482, 486 (9th Cir.1987). Indeed, '50% of the jurors' time [is] spent discussing personal experiences.' Kessler, 'The Social Psychology of Jury Deliberations,' *in The Jury System in America* 69, 83 (R. Simon ed.1975)."

There are limitations on how a juror may apply personal experiences—personal experiences are relevant only for purposes of interpreting evidence in the record. *United States v. Jones* (C.A.6, 1978), 580 F.2d 219, 222. The courts draw the line when personal experience becomes personal knowledge of facts specific to the litigation. See, *e.g.*, *Silagy v. Peters* (C.A.7, 1990), 905 F.2d 986; *Hard v. Burlington N. RR.* (C.A.9, 1989) 870 F.2d 1454 (juror who allegedly worked for the defendant had personal knowledge of the defendant's settlement practices); *In re Beverly Hills Fire Litigation* (C.A.6, 1982), 695 F.2d 207, 211–212, certiorari denied (1983), 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (misconduct occurred when juror conducted at-home experiment on the evidence and reported his findings to other veniremen).

McMickens told the court that the juror alleged to have engaged in misconduct "was talking about stuff like, well, the way it is did [*sic*] on the job, her job, like that." On its face, the juror's statement is a text-book example of a juror applying her own personal experience to the case at hand. The complaint is so innocuous that it required no further investigation from the court, particularly when appellant failed to ask the court to conduct further inquiry.

Just how the majority concludes that the juror was applying a different standard of care is obscure. I believe that the court gave this issue the hearing it required. Nothing juror McMickens alleged required the court to go any further in investigating misconduct. Under any rational plain-error analysis, we must find that appellant has failed her burden on appeal.

Finally, I take issue with the majority's conjecture that McMickens' complaints "raised the specter that any one of the several jurors on the panel" who worked in the medical field could have been engaged in misconduct by informing the jury of their job experiences. There is simply no evidence in the record to support this conjecture. It is reckless to assume that any person who works in the

medical field is incapable of rendering a fair verdict because they would apply their own life experiences. R.C. 2313.42 lists the causes for challenge of persons called as jurors, and nothing in that code section permits a blanket challenge for cause of medical personnel. The majority's dicta might suggest that persons with medical backgrounds would never be competent to sit on juries, and that conclusion is clearly contrary to both the law and public policy.

Because I would overrule the assignments of error, I respectfully dissent and would affirm the trial court *in toto.*

## APPENDIX
## ATTACHMENT A

Appellants' assignment of error

I. The trial court committed prejudicial error during jury selection.

II. The trial court committed prejudicial error in allowing the testimony of defense expert David Longworth, M.D., over plaintiffs' objection.

III. The trial court committed prejudicial error in allowing the testimony of defense expert Arthur Wheeler, M.D., over plaintiffs' objection.

IV. The trial court committed prejudicial error during jury deliberations.

V. The jury verdict should be reversed because it was against the manifest weight of the evidence.

VI. The trial court committed error in failing to grant plaintiffs' motion for a new trial.

## JOURNAL ENTRY

### Decided June 7, 2001

TIMOTHY E. MCMONAGLE, Judge.

Defendants-appellees Rajhendra K. Mehta, M.D., 4M Emergency Systems, Inc., and Moudaccer Mounajjed, D.O., have filed motions for reconsideration of this court's opinion and judgment entry rendered on April 12, 2001. In that opinion, we concluded that the culmination of errors that occurred during trial denied appellants their right to a fair and impartial trial. We held that the trial court (1) did not conduct the proper constitutional analysis in evaluating appellant's *Batson–Hicks* challenge to a peremptory challenge, (2) committed reversible error in allowing Dr. David Longworth to provide expert testimony at trial because his opinion was not held with the requisite degree of certainty, (3) abused its discretion in allowing Dr. Arthur Wheeler to "fudge" his testimony so as to meet the qualifications for providing expert testimony under the parameters of Evid.R. 601(D), and (4) failed to protect appellant's right to trial by a jury of

unbiased and unprejudiced jurors willing to decide the case solely on the evidence presented to it by not investigating an allegation of juror misconduct brought to the trial judge during jury deliberations. Accordingly, we reversed the judgment of the trial court in favor of appellees and remanded the case for a new trial.

The test generally applied to a motion for reconsideration in the court of appeals is whether the motion calls to the attention of the court an obvious error in its decision or raises an issue for consideration that was not considered at all or was not fully considered by the court when it should have been. See, *e.g., Chandler & Assoc., Inc. v. America's Healthcare Alliance, Inc.* (1997), 125 Ohio App.3d 572, 709 N.E.2d 190; *Woerner v. Mentor Exempted Village School Dist. Bd. of Edn.* (1993), 84 Ohio App.3d 844, 619 N.E.2d 34; *State v. Gabel* (1991), 75 Ohio App.3d 675, 600 N.E.2d 394; *Columbus v. Hodge* (1987), 37 Ohio App.3d 68, 523 N.E.2d 515; *Matthews v. Matthews* (1981), 5 Ohio App.3d 140, 5 OBR 320, 450 N.E.2d 278.

Dr. Mehta, citing *State v. Gowdy* (2000), 88 Ohio St.3d 387, 727 N.E.2d 579, submits that this court should reconsider its decision that the trial court did not properly apply the *Batson* test to appellants' allegation of racial discrimination in opposition to appellee's peremptory challenge. Dr. Mehta argues that an appellate court can overturn a trial court's finding on the issue of discriminatory intent only if that finding is "clearly erroneous," and there is no evidence here that the trial court finding of nondiscriminatory intent was clearly erroneous.

Dr. Mehta's argument and citation to *Gowdy, supra,* indicates that he misunderstands our decision. Our holding that the trial court erred in not finding discriminatory intent was based on the trial court's abbreviated and inadequate analysis of the constitutional question presented by appellants' *Batson–Hicks* challenge—not on the evidence or lack thereof of discriminatory intent in appellee's peremptory strike. As we stated in our opinion:

"Appellants' argument regarding appellee's peremptory challenge to remove Juror Number 7 from the venire is *not* that appellee's exercise of its peremptory challenge constituted racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Rather, appellants' argument is that the trial court committed reversible error because it did not conduct the proper constitutional analysis in determining that appellee St. Alexis Hospital was not racially motivated in excluding an African American from the jury through the use of a peremptory challenge. We agree." (Emphasis in original.)

Accordingly, we held that by abruptly interrupting counsel and immediately ruling upon appellants' *Batson–Hicks* challenge before counsel had concluded his explanation of his alleged nondiscriminatory reason for the peremptory strike, the trial judge failed to adequately analyze the constitutional question presented

by appellants' challenge. In short, the trial judge did not bother even to complete the first step of the three-part *Batson* inquiry before ruling on the challenge.

Dr. Mehta's citation to *Gowdy* is therefore inapposite. In *Gowdy,* the record indicated that the trial judge ruled on the plaintiff's *Batson–Hicks* challenge to the state's peremptory challenge of a prospective juror after the prosecutor set forth three valid reasons for challenging the juror. The Supreme Court of Ohio found that "[w]hile the trial judge could have made more explicit findings on the record regarding the challenges," the trial court had properly completed all three steps of the three-part *Batson* inquiry and, accordingly, did not abuse its discretion in allowing the state to exercise a peremptory challenge against a prospective juror. That was clearly not what happened here.

Dr. Mehta also asserts that this court should reconsider its decision regarding Dr. Wheeler's testimony because his trial testimony "clarified" that he was competent to testify. This argument was considered and rejected in our decision rendered on April 12, 2001.

Similarly, we considered and rejected the argument made by Dr. Mounajjed and 4M Emergency Systems that the proximate cause testimony of Dr. Longworth, admitted even though he acknowledged that he did not hold his opinion with the requisite degree of certainty, was harmless error because the jury found that Dr. Mounajjed was not negligent. The "reality" is that the jury reached the issue of proximate cause, as demonstrated by its note to the judge indicating they were stalemated on this issue.

Finally, Dr. Mehta asserts that this court erred in ordering a new trial because any juror misconduct was harmless. Dr. Mehta contends that because the jury found that St. Alexis Hospital was negligent, any misconduct "could have only inured to the benefit of the plaintiff" and, hence, there was "actual prejudice" to appellants.

Dr. Mehta's argument ignores the fact that although the jury found that St. Alexis had breached the standard of care, it also found that St. Alexis Hospital's breach was not the proximate cause of appellants' damages. In light of this finding, the extraneous information brought to the attention of the jury by the unnamed nurse-juror may indeed have been prejudicial to appellants. As we stated in our opinion, however, the trial judge's complete failure to investigate the allegation of juror misconduct makes it "impossible to ascertain, much less demonstrate, whether or not [appellants] were actually prejudiced by the alleged juror misconduct" and what parts, if not all, of the jury verdict were tainted.

Appellees have not raised an obvious error in our prior decision, nor have they raised an issue that was not previously considered. Appellees' motions for reconsideration are therefore denied.

*Motion for reconsideration denied.*

DIANE KARPINSKI, A.J., concurs.

MICHAEL J. CORRIGAN, J., dissents.