JOURNAL ENTRY AND OPINION
The appellant, Randy Pennington, appeals the verdict of the jury finding him guilty of two counts of rape and one count of kidnapping and the subsequent term of incarceration imposed by the trial court. For the reasons set forth below, we affirm the decision of the trial court.
On June 15, 2000, the Cuyahoga County Grand Jury returned a three-count indictment against Pennington. Counts one and two charged him with the crime of rape, pursuant to R.C. 2907.02. Both counts contained sexually violent predator specifications and a repeat offender specification. Count three charged him with kidnapping, pursuant to R.C. 2905.11, which also contained a sexual motivation specification.
At trial, the victim testified that at the end of their Memorial Day celebration, she and her boyfriend, Eudean Toney, drove to Hank's Bar located near East 93rd Street and Union Avenue. Toney parked the car in the bank parking lot next to the bar, and the victim unsuccessfully tried to withdraw money from the bank's ATM machine.
The victim and Toney then entered the bar at which point Toney informed the victim that he was leaving. The victim told Toney that she was not leaving with him and left the bar on her own, proceeding to walk across the street. Toney then became both physically and verbally abusive toward the victim and tried to convince her to leave with him. When the victim refused to go with him, Toney left her on the side of the street and drove off.
The victim, now alone, began walking down East 93rd Street looking for a pay phone or an ATM machine. At this point, Pennington allegedly drove by the victim twice, both times asking her if she needed a ride. On his second offer, the victim accepted and entered his vehicle.
Pennington drove down several streets and stopped on a darkened side street. According to the victim, he then produced a knife and told the victim, I'm going to give you what the fuck you want. He held the knife to the victim's throat and first forced her to perform oral sex and then forced her to engage in vaginal intercourse.
The victim testified that after these alleged actions, she convinced Pennington to return to Hank's Bar where they could have a drink. The appellant and victim drove to Hank's Bar where she wrote her name and phone number in his black book and then exited the vehicle. She walked to the driver's side door by way of the back of the vehicle to get the appellant's license plate number and then continued talking to him through the driver's side window, attempting to remember his physical description. She then walked around the back of the vehicle again and came back to the passenger side window.
The victim testified that at that point, Toney reappeared, grabbed the victim away from Pennington's car and assaulted her. Pennington drove off while Toney continued to assault the victim. At some point, Toney put the victim into his car and drove back to their apartment complex, all the while assaulting her. When they returned to the apartment complex and the victim entered her apartment, she called 911" and reported that she had been raped by one man and then assaulted by her boyfriend.
The police arrived and took the victim's statement. The victim was then taken to Euclid Meridia Hospital where she was examined and a rape kit was prepared. Police dispatch relayed the address listed on the registration of the vehicle Pennington had been driving, and police units headed to the home of Cassandra Gorie, at 11909 Avon Avenue, Cleveland Ohio, the registered owner of the vehicle.
Patrolman Kwan was the first officer to arrive on scene. As he pulled up to the house, the vehicle matching the victim's description was parked on the street in front of the house. As the officer was looking into the vehicle, Cassandra Gorie pulled into the driveway of the home. The patrolman briefly interviewed Cassandra Gorie as to who may have driven the vehicle on the night of the alleged rape. She informed the officers that her son, Tommy, may have driven the car that night and indicated that she would go inside and have Tommy come out to talk to the officers.
When Tommy exited the house, he was put into the back of the squad car. He was being transported down to the police station when he informed the police that his mother's boyfriend, Randy, was in the house. The officers turned around and returned to the Gorie house to talk with Randy. As the officers approached the house, they were informed by another officer that a male suspect had just run out of the side door of the Gorie house. All of the officers began foot pursuit for the suspect, but they were unable to track him down.
The officers returned to the Gorie house where they discovered Pennington hiding under a car. He was arrested and placed in the back of a police car.
Pennington was subsequently charged with two counts of rape and one count of kidnapping and was found guilty on all three counts of the indictment. From this judgment of conviction, he filed timely notice of appeal and assigns the following errors:
 I. RANDY PENNINGTON WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO EQUAL PROTECTION UNDER THE LAWS WHEN THE STATE REMOVED THE LONE BLACK JUROR FROM THE VENIRE PANEL LEAVING AN ENTIRELY WHITE JURY.
 II. RANDY PENNINGTON HAS BEEN DEPRIVED OF HIS LIBERTY WITHOUT DUE PROCESS OF LAW BY THE SENTENCE IMPOSED IN THE CASE AT BAR BECAUSE IT DID NOT COMPORT WITH OHIO'S NEW SENTENCING SCHEME.
 III. RANDY PENNINGTON'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Appellant's first assignment of error contends that when the prosecutor used a peremptory challenge to dismiss the last of two black jurors, this constituted a violation of the appellant's equal protection rights as found in Batson v. Kentucky (1986), 476 U.S. 79.
The appellant maintains that there were only two black potential jurors in the entire venire panel, and this did not properly represent a cross-section of the county, especially when both the appellant and all other individuals involved in this case were black. The first black juror was dismissed for cause, and after the peremptory dismissal of the remaining black juror, appellant's counsel made a Batson objection, which was overruled. Appellant contends that the dismissal of the last remaining black juror left him before an all white jury, depriving him of his constitutional rights.
In Hicks v. Westinghouse Materials Co. (1997), 78 Ohio St.3d 95,98-99, the Ohio Supreme Court set forth the analysis used in determining whether a peremptory challenge is racially motivated. The court found:
 The United States Supreme Court set forth in Batson v. Kentucky (1986), 476 U.S. 79, 90 L.Ed.2d 69, 106 S.Ct. 1712, the test to be used in determining whether a peremptory strike is racially motivated. First, a party opposing a peremptory challenge must demonstrate a prima-facie case of racial discrimination in the use of the strike. Id. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87. To establish a prima-facie case, litigant must show he or she is a member of a cognizable racial group and that the peremptory challenge will remove a member of the litigant's race from the venire. The peremptory-challenge opponent is entitled to rely on the fact that the strike is an inherently discriminating device, permitting those to discriminate who are of a mind to discriminate. State v. Hernandez(1992), 506 U.S. 898, 113 S.Ct. 279, 121 L.Ed.2d 206. The litigant must then show an inference or inferences of racial discrimination by the striking party. The trial court should consider all relevant circumstances in determining whether a prima facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority members is present. See Batson at 96-97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.
 Assuming a prima-facie case exists, the striking party must then articulate a race-neutral explanation related to the particular case to be tried. Id. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88. A simple affirmation of general good faith will not suffice. However, the explanation need not rise to the level justifying exercise of a challenge for cause. Id. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. The critical issue is whether discriminatory intent is inherent in counsel's explanation for use of the strike; intent is present if the explanation is merely a pretext for exclusion on the basis of race. Hernandez v. New York (1991), 500 U.S. 352, 363, 111 S.Ct. 1859, 1868, 114 L.Ed.2d 395, 408.
 Last, the court must determine whether the party opposing the peremptory strike has proved purposeful discrimination. Purkett v. Elem (1995), 514 U.S. 765, 767, 115 S.Ct. 1769, 1770, 131 L.Ed.2d 834, 839. The critical question which the trial judge must resolve is whether counsel's race-neutral explanation should be believed. Hernandez v. New York, 500 U.S. at 365, 111 S.Ct. at 1869, 114 L.Ed.2d at 409.
 * * * Trial judges must exercise a considerable care in reviewing a claim of racial discrimination in the jury selection. A judge should make clear, on the record, that he or she understands and has applied the precise Batson test when racial discrimination has been alleged in opposition to a peremptory challenge. Cunningham v. St. Alexis Hosp. (April 12, 2001), Cuyahoga App. No. 77836, unreported, 2001 Ohio App. LEXIS 1701, at 4-8.
The Supreme Court further established in Hicks, supra at 102, the appropriate standard of review for a claim raised under Batson:
 * * * Review of a Batson claim largely hinges on issues of credibility. Accordingly, we ordinarily defer to the findings of the trial court. See Batson at 98, S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21. Whether a party intended to racially discriminate in challenging potential jurors is a question of fact, and in the absence of clear error, we will not reverse the trial court's determination. Hernandez v. New York, 500 U.S. at 369, 111 S.Ct. at 1871, 114 L.Ed.2d at 412; State v. Hernandez, 63 Ohio St.3d at 583, 589 N.E.2d at 1314.
We apply the three-part test to the scenario at bar. The prosecuting attorney asserted a peremptory strike against the sole remaining black juror of the venire panel. After the appellant's attorney challenged his strike, the prosecutor willingly, without order from the court, gave the reason for his peremptory challenge. Once the proponent explains the challenge and the trial court rules on the ultimate issue of discrimination, whether or not a prima facie case was established becomes moot. State v. White (1999), 85 Ohio St.3d 433, citing Hernandez v. New York (1991), 500 U.S. 352, 359. Therefore, we need not review the first step of the Batson test.
In step two under Batson, the issue is whether or not the proponent gave a race-neutral explanation for his peremptory challenge. The `explanation need not rise to the level of justifying exercise of a challenge for cause.' White, 85 Ohio St. at 437, citing Batson,476 U.S. at 97. The prosecutor stated:
 My decision to dismiss this juror had nothing to do with his race and had everything to do with the age of the particular juror. He is the same age as this defendant. The testimony and witnesses who are going to come in will testify that this man has lived for the past two, three years with the same women and I'm concerned the age of these two connected together and the fact they have children of a similar age causes me concern.
 But, mostly, when I was voir diring I was asking to the standard of proof being beyond a reasonable doubt, and I asked several jurors if they understood the difference between beyond a reasonable doubt and all doubt, and he was the only one who hesitated. And I noted his hesitation and asked him if he thought it was a fair burden of proof and he again hesitated but then indicated yes, * * * I don't think I'm not comfortable with the idea that he understands the appropriate burden of proof. His hesitation causes me concern.
The prosecutor satisfied the second step of the Batson test by giving the court a race-neutral explanation. We must therefore look toward the third and final step of the Batson test.
In the final step under Batson, the court must determine whether or not the state did, in fact, have a discriminatory motive for striking the juror. The burden of persuasion always stays with the opponent of the strike. Purkett v. Elem (1995), 514 U.S. 765, 768. Under this step, a reviewing court must extend deference to the trial court since this is the stage that the persuasiveness and credibility of the justification offered by the striking party becomes relevant. Id. at 768.
The trial court stated:
 From your perspective I can understand the obvious objection of removing an African-American man when he is the only African-American on that jury. It is a legitimate concern, it is a legitimate objection. I have to interject here not only the rationale of the prosecutor, which I find to be legitimate to an extent, but also knowing Mr. Mahoney, and I don't know if this is proper or not proper but I will say I do know him to be a fair man, maybe tough at times, but fair in the sense he doesn't look at race as a deciding factor in the case. And I found that because I have done multiple, multiple trials with him. That is the only reason that I can speak to that issue. Aside from that, I think there are legitimate reasons to have Mr. Johnson removed although there is no remaining African-American. I don't think it meets Batson to the extent where I should deny his peremptory so I will overrule it.
This court cannot find the trial court's explanation to be an abuse of discretion. As stated above, the trial court's logic and reasoning is entitled to deference since it turns largely on the trial court's evaluation of credibility. Batson, 476 U.S. at 98. The burden of persuasion remains with the opponent of the strike. The trial court noted the statement made by the juror during voir dire and considered the argument of the state to be a legitimate concern given the severity of the case and the need to comprehend the proper burden of proof. The judge further discussed the high credibility of the state's counsel, which this court must take into consideration.
Appellant's first assignment of error is without merit. The trial court properly overruled the appellant's objection under Batson as the state's peremptory strike could not be determined to have been made based on a discriminatory motive.
Appellant's second assignment of error contends that the trial court erred when it imposed maximum sentences on all three counts with two of them to run consecutively.
R.C. 2929.14(C) provides in pertinent part:
 * * * [T]he court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offender pursuant to division (A) of this section only upon offenders who committed the worst form of the offense, upon offenders who pose the greatest likelihood of committing future crimes * * *.
When a trial court imposes the maximum sentence authorized for an offense by R.C. 2929.14(A), the court is required to make findings that the offender meets one or more of the criteria found in R.C. 2929.14(C) and give the reasons for imposing the sentence. State v. Zwiebel (Aug. 29, 2000), Franklin App. No. 00AP-61, unreported, 2000 Ohio App. LEXIS 3882, at 7; State v. Anger (Aug. 3, 2000), Allen App. No. 1-2000-04, unreported, 2000 Ohio App. LEXIS 3677.
Additionally, in order for a trial court to sentence a defendant to consecutive terms of incarceration, the record must show that the trial judge made the findings as required by R.C. 2929.14(E)(4).
R.C. 2929.14(E)(4) states in pertinent part:
 If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that the consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
Once the trial court has made its required findings under 2929.14(E), it must then satisfy R.C. 2929.19(B)(2)(c). Until both code sections have been satisfied, the rendering of consecutive prison terms is not proper under the statutory requirements. Only upon a showing of clear and convincing evidence may a reviewing court disturb a sentence imposed under Senate Bill 2, R.C. 2953.08(G)(1)(a) and (d). State v. Beck (March 30, 2000), Cuyahoga App. No. 75193, unreported, 2000 Ohio App. LEXIS 1349, at 8; See also, State v. Garcia (1998), 126 Ohio App.3d 485,710 N.E.2d 783. Further, when a trial judge imposes consecutive sentences, but fails to comply with the three findings set forth in R.C.2929.14(E)(4), the trial court has committed reversible error. State v. Albert (1997), 124 Ohio App.3d 325, 705 N.E.2d 1274.
Pursuant to R.C. 2929.19(B)(2)(c), the trial court must additionally make a finding that gives its reasons for selecting the sentence imposed if the court is indeed going to impose consecutive sentences. Therefore, before a court imposes consecutive sentences, it must be able to justify its findings under 2929.14(E). This court has read `finding' to mean the various findings outlined in R.C. 2929.14 and `reasons' should mean the trial court's stated basis for its `findings.' State v. Berry (March 9, 2000), Cuyahoga App. No. 75470, 75471, unreported, 2000 Ohio App. LEXIS 910, at 6.
At the time of sentencing, the trial court stated:
 By law I have to make a finding. The Court finds that the offender committed the worst form of the offense. The facts indicate a knife to the throat, forced oral and vaginal intercourse. * * * The Court finds this is necessary to, not only protect the public, but to punish the offender. It's not disproportion to his conduct and the danger it poses and the harm is so great or unusual that a single term does not adequately reflect the seriousness of this conduct. The Court finds this to be a brutal rape deserving of this sentence as the jury has found the facts to be.
Upon a review of the record, the trial court properly complied with the sentencing guidelines established for the imposition of maximum and consecutive sentences. The trial court stated that the appellant committed the worst form of the offense and considered the fact that this case involved a knife to the throat,[and] forced oral and vaginal intercourse. Further, the factors necessary for the imposition of a consecutive sentence were also properly determined and stated on the record. The factors listed by the trial court were properly reinforced by the trial court's reasoning for the imposition of consecutive sentences. The trial court determined that this act was a brutal rape deserving of this sentence, and further stated, I can't think of anything more brutal than having a knife against your throat to force you to do it. I can't think of anything, not knowing whether you're going to live or die even after the rape.
The trial court properly sentenced the appellant under the sentencing guidelines. The appellant's second assignment of error is without merit.
Appellant's final assignment of error contends that his convictions are against the manifest weight of the evidence. He maintains that the illogical testimony of the victim cannot support a rape and kidnapping conviction.
In State v. Martin (1983), 20 Ohio App.3d 172, the court stated:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury most clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
Additionally, the Supreme Court of Ohio, in State v. Thompkins (1997), 78 Ohio St.3d 380 stated:
 Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicated clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them.
Further, in Tibbs v. Florida (1982), 457 U.S. 31, the United States Supreme Court stated:
 A reversal based on the weight of the evidence, moreover, can occur only after the State both has presented sufficient evidence to support conviction and has persuaded the jury to convict.
Although the appellant contends his conviction is based solely on the illogical testimony of the victim, a review of the record shows that much credible evidence was presented to support his conviction.
The trial court heard evidence of the alleged rape from the victim as well as from others discussing the conduct of the victim and the appellant. The victim testified that after accepting the offer by the appellant for a ride home, the appellant drove onto a secluded street where he put a knife to her throat and told her, I'm going to give you what the fuck you want. The victim testified that the appellant threatened her and forced her to perform oral sex on him. The victim, still afraid for her life, was then instructed to pull her shorts and underwear down to her ankles at which point the appellant then proceeded to have vaginal intercourse with her.
The state further produced testimony from Patrolman Thomas Arriza regarding the incident in question. He testified that the victim told him that she had been beaten and raped, but by two different people. The patrolman further stated that at the hospital, the victim appeared very quiet, introverted, like she was afraid, and that he took her responses to his questions as being genuine and honest.
The appellant's girlfriend, Cassandra Gorie, with whom he had been living at the time, also testified. She testified that when the police showed up at her house and questioned her, she went inside the house. Gorie indicated that the first person she saw was the appellant, and the first thing he said was, I got into a fight. She further stated that while she was talking to him, he looked kind of nervous and he was running around the house like he was looking for a place to hide.
She further testified that she was also present when the appellant ran out of the house while she was talking to a police officer. The appellant ran into the back yard and then apparently came back around and crawled under a vehicle in the driveway to hide from the police.
In regard to the weapon used in the attack, Gorie testified that the car the appellant was driving that night, in which he allegedly raped the victim, did have a steak knife in it and it had been there for some time. The police also saw the steak knife in the car at the time the car was towed.
The state also called Patrolman Sean Dial as a witness. Patrolman Dial was one of the officers that transported the appellant from Gorie's house to the police station. He testified that after the appellant was given his Miranda warnings and placed into the patrol car, he told the officers that he had had consensual sex with the victim. He further stated that he had been with the victim the entire day, they had gone to the movies and they had engaged in sexual intercourse at his friend's house. The officer questioned the appellant about his friend's address, which he could not supply, and asked what movie the appellant had taken the victim to see, which the appellant could not remember.
The state presented ample evidence to demonstrate that the appellant had indeed committed the crimes for which he was convicted, and the defense failed to present any evidence to suggest otherwise. The appellant's third assignment of error is without merit.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
COLLEEN CONWAY COONEY, J., AND TERRENCE O'DONNELL, J., CONCUR.